2013 UT App 207

# THE UTAH COURT OF APPEALS

STEPSAVER, INC.,
Petitioner,
*v.*
DEPARTMENT OF WORKFORCE SERVICES, WORKFORCE APPEALS
BOARD AND RUSSELL TALBOT,
Respondents.

Opinion
No. 20120149-CA
Filed August 22, 2013

Original Proceeding in this Court

Robert J. Poulsen and Joseph M. Skousen,
Attorneys for Petitioner
Suzan Pixton, Attorney for Respondent
Department of Workforce Services, Workforce
Appeals Board

JUDGE GREGORY K. ORME authored this Opinion, in which
JUDGES CAROLYN B. MCHUGH and MICHELE M. CHRISTIANSEN
concurred.

ORME, Judge:

¶1     Stepsaver, Inc. petitions for review of the Workforce
Appeals Board's decision affirming the award of unemployment
benefits to Russell Talbot. Stepsaver argues that the Board erred in
determining that Stepsaver offered no legally competent evidence
to support its claim that Talbot was terminated for just cause. We
agree with Stepsaver, set the Board's decision aside, and instruct
the Board to reevaluate Stepsaver's contentions.

## BACKGROUND

¶2     Talbot began working for Stepsaver as a route delivery
driver in February 2009 and was terminated in October 2011.

Stepsaver's company policy made clear that an employee would be terminated if he or she was the subject of three driving-related complaints. During his employment, Talbot was the subject of three such complaints. After each of the first two complaints, Talbot was given a written performance review, which he signed, acknowledging both the complaint and that he would be terminated if further incidents occurred.

¶3    The first write-up involved a woman complaining that Talbot cut her off in traffic and was driving so erratically that she was concerned for her safety and for that of the children in her car. The second write-up involved a customer's employee claiming that Talbot sped through their parking lot while talking on a cell phone. Both speeding and cell phone use are violations of Stepsaver's driving policy. The final incident involved a man reporting that Talbot was driving erratically on Bangerter Highway with a cell phone to his ear. When confronted by management, Talbot claimed that he had not been near Bangerter Highway during the time alleged, was not talking on his cell phone, and was not going more than 63 miles per hour. Stepsaver checked its GPS monitoring system, which revealed that Talbot had traveled in excess of 65 miles per hour and that he had indeed been on Bangerter Highway at the time of the alleged incident. A Stepsaver manager then spoke directly to the man who complained and determined that Talbot was untruthful in his denial. Talbot was terminated shortly thereafter and subsequently applied for unemployment benefits. Stepsaver filed a response citing "[u]nsafe driving and customer complaints" as its reasons for terminating Talbot.[1]

---

1. Talbot was also reprimanded during his time as an employee for becoming confrontational and "using the 'F' word" with a customer's employees and for being on his cell phone when he should have been interacting with customers. Again, with each of these incidents, Talbot signed a document acknowledging the complaints and the fact that he could be terminated if his performance did not improve. However, these complaints were not

(continued...)

¶4      The Utah Department of Workforce Services (DWS) determined that Talbot was terminated for just cause. He appealed and was granted a hearing before an Administrative Law Judge (the ALJ). Presented at the hearing as exhibits were Talbot's signed performance review documents; forms related to the unemployment claim and appeal, including responses from Talbot and Stepsaver as well as notes taken by DWS employees who had talked to both parties; and an email between two Stepsaver employees regarding the third driving complaint that immediately preceded Talbot's termination. The ALJ also heard testimony from both Talbot and the manager. Other Stepsaver managers and employees were available by phone to testify, but the ALJ determined that their testimony would be repetitive.

¶5      Talbot testified that the first person who complained was tailing him closely and seemed upset that he was not going fast enough. He said that he was on his hands-free device rather than a cell phone at the time of the second incident and that he could not have been speeding because it would have been impossible to accelerate so quickly between the gated entrance and the end of the customer's parking lot. Talbot also testified that the customer's employee later acknowledged he may not have been going as fast as she first reported. As to the final incident, Talbot testified that he had not been driving unsafely and that he used his hands-free device on that day as well. He explained that he had not deliberately lied to his managers about his location but had believed that he had not been in the Bangerter Highway area at the time alleged.

¶6      The manager testified that Stepsaver employees other than himself had taken the initial phone calls regarding all three incidents. However, he testified that he spoke directly with the man who called regarding the third incident in order to get further clarification. The manager also testified that while Stepsaver

_____

1. (...continued)
part of the identified reason for Talbot's termination and do not warrant further discussion in this opinion.

received a call from the customer in the second incident confirming that Talbot had not been going as fast as was originally reported, the customer maintained that Talbot had been on a cell phone. When asked why Talbot was terminated, the manager answered, "[D]riving habits mainly—driving habits and company policy." The ALJ specifically asked whether Stepsaver had a safe driving policy in place and, if so, how that policy addressed driving complaints. The manager confirmed that Stepsaver did in fact have a policy in place and explained, "Typically, . . . for the first time around, . . . they're warned about it. The second time around they're suspended for two days. And the third time around they're terminated."

¶7     The ALJ determined that Talbot was terminated without just cause because Stepsaver had provided only hearsay evidence to establish that Talbot had actually committed the driving violations in question. The Board affirmed the ALJ's decision. The Board determined that Talbot was discharged for "unsafe driving and using his cell phone while driving" but agreed with the ALJ that Stepsaver only offered hearsay evidence while Talbot offered firsthand evidence in denying any wrongdoing. Ruling that none of the evidence adduced by Stepsaver qualified under any exception to the hearsay rule, the Board determined that Stepsaver had failed to provide any legally competent evidence to show that Talbot committed the driving violations of which he was accused and therefore had failed to demonstrate Talbot's culpability—one of the requirements for establishing that a termination was for just cause. Stepsaver seeks judicial review of the Board's decision.

ISSUE AND STANDARD OF REVIEW

¶8     Stepsaver argues that the Board erred in determining that Stepsaver failed to offer evidence other than inadmissible hearsay in support of its decision to terminate Talbot. "The determination of whether evidence constitutes hearsay is a question of law that we review for correctness." *Prosper, Inc. v. Department of Workforce Servs.* (*Prosper I*), 2007 UT App 281, ¶ 8, 168 P.3d 344.

ANALYSIS

¶9　In order to claim unemployment benefits, an employee must have been terminated without just cause. Utah Code Ann. § 35A-4-405(2)(a) (LexisNexis Supp. 2013);[2] Utah Admin. Code R994-405-201. *See Prosper I*, 2007 UT App 281, ¶ 9. The employer bears the burden of proving that a termination is supported by just cause. *Bhatia v. Department of Emp't Sec.*, 834 P.2d 574, 577 (Utah Ct. App. 1992). To establish just cause, an employer must show (1) that the claimant was culpable, (2) that the claimant had knowledge of the conduct expected of him, and (3) that the conduct leading to termination was within the control of the claimant. *Id.* The Board concluded that Stepsaver failed to establish culpability on Talbot's part and consequently did not reach the merits on the second or third requirements for just cause.

¶10　For purposes of "just cause" analysis, culpability is defined as conduct "so serious that continuing the employment relationship would jeopardize the employer's rightful interest." Utah Admin. Code R994-405-202(1). When proving culpability, an employer may introduce hearsay evidence. *See Prosper I*, 2007 UT App 281, ¶ 10; Utah Admin. Code R994-508-109(9). However, "findings of fact must be supported by a residuum of legally competent evidence, and therefore cannot be based solely on *inadmissible* hearsay." *Prosper I*, 2007 UT App 281, ¶ 11 (emphasis added).

¶11　The validity of the Board's determination that Stepsaver failed to introduce any legally competent evidence to demonstrate Talbot's culpability turns on properly identifying the reasons for which Talbot was fired. The Board argues that Stepsaver fired Talbot only for actual driving violations, including talking on a cell phone while driving. If this were true, the Board might have been correct in determining that only inadmissible hearsay evidence was

---

2. Because the statutory provisions in effect at the relevant time do not differ materially from the statutory provisions now in effect, we cite the current version of the Utah Code as a convenience to the reader.

introduced by Stepsaver. No firsthand accounts were offered at the hearing before the ALJ by witnesses who actually saw Talbot using a cell phone while driving or otherwise driving unsafely. The only evidence offered were reports of complaints made to Stepsaver by various individuals. However, we conclude that both the ALJ and the Board failed to accurately focus on a predominant reason for Talbot's termination—multiple customer complaints, albeit complaints related to Talbot's driving.

¶12    On the form filed in response to Talbot's unemployment claim, Stepsaver clearly stated that Talbot was fired for "[u]nsafe driving *and* customer complaints." (Emphasis added.) Stepsaver went on to explain that Talbot had "been written up previously for [the] same type of complaints and told [that] any future occurrences would result in immediate termination." Additionally, Stepsaver stated that it had been harmed by the complaints about Talbot due to the "potential loss of customers and possible accident[s] due to unsafe driving." At the hearing before the ALJ, the manager testified that Talbot was discharged for "driving habits and company policy," and he explained that company policy called for an employee to be terminated upon the occurrence of three customer complaints related to driving. When asked why driving complaints are so detrimental to Stepsaver's business interests, the manager explained, "[W]e drive mobile billboards, you know, . . . our vehicles stick out like a sore thumb." He emphasized that because the company's image is vital to its success, it is important that people perceive Stepsaver as having "good looking equipment, good looking people," and employees that drive in a "safe manner."

¶13    Our analysis in *Prosper I*, where we considered a similar set of facts, is instructive. There, a manager provided a spreadsheet that documented the customer complaints made against an employee. 2007 UT App 281, ¶ 5. The Board determined that no firsthand evidence of the claimant's performance had been offered and therefore concluded that culpability had not been established. *Id.* ¶ 6. We reversed, determining that the evidence was not hearsay because the employer offered evidence of complaints "not to establish the truth of any particular complaint, but simply to

show she was the object of numerous customer complaints and thus an employee who did not perform satisfactorily," *id.* ¶ 13, i.e., to the satisfaction of the business's customers, regardless of whether her performance was satisfactory in some absolute sense.

¶14 We conclude that, in light of all the evidence, Stepsaver fired Talbot not only because the company was concerned about his driving habits but also because of the complaints Stepsaver received regarding Talbot, which Stepsaver concluded were having a negative impact on it. *See id.* Indeed, that was Stepsaver's position at the administrative stage when the claims were first raised, as shown by the documents it filed, as well as through the testimony it offered before the ALJ, as supplemented by its exhibits. Talbot was fired because multiple complaints were made against him and not, as the Board now contends, purely because of his unsafe driving and cell phone use.

¶15 When viewed correctly, none of Stepsaver's key evidence presents a hearsay problem because it was "not introduced for the truth of the matter asserted—i.e., that the customer complaints were true—but simply to prove that the complaints had been made," *see id.*, and that Talbot was therefore subject to termination under Stepsaver's customer complaint policy. While properly regarded as hearsay had they been offered to prove the truth of the matters asserted, the manager's testimony, the signed performance reviews, and other evidence regarding customer and public complaints are not *inadmissible* hearsay, if hearsay at all, because their primary purpose was to show that several complaints were made and not that the substance of each complaint was true. The fact that the ALJ disallowed testimony from other Stepsaver managers and employees regarding the complaints because the testimony would have been repetitive supports our conclusion. We can only assume that the ALJ denied the other managers and employees the opportunity to testify because the ALJ already had sufficient evidence and testimony before him to determine that the complaints had actually been made.[3]

_____

3. The Board argues that the position we adopt might subject
(continued...)

¶16 This case, therefore, comes down to the very narrow question of whether the number of complaints Stepsaver received about Talbot during the year-and-a-half that he was employed by Stepsaver might establish Talbot's culpability. We conclude that it might, indeed. Stepsaver's policy regarding driving-related customer complaints was clear: on the third complaint, an employee would be terminated. Stepsaver followed its policy, with Talbot's acknowledgment as evidenced by his signed performance reviews. Although we previously upheld a determination by the Board that employee culpability cannot be established by the mere existence of complaints alone, *see Prosper, Inc. v. Department of Workforce Servs.* (*Prosper II*), 2008 UT App 250, ¶ 7, 193 P.3d 1061, our conclusion here rests upon Stepsaver's three-complaint dismissal policy, the existence of the requisite three complaints, and especially Talbot's signed performance reviews indicating his understanding that subsequent complaints would result in his immediate termination.

¶17 Further, the number of complaints made against Talbot is telling and supportive of a determination of culpability when compared with the number of complaints received by the company about other Stepsaver employees. The manager testified that any complaint, let alone three in such a short period of time, was extremely uncommon. He stated, "[I]t's concerning mainly due to the fact that, number one, we very, very, very seldom get any type of complaint." The company was justifiably concerned about the damage that customer dissatisfaction and complaints from members of the public could have on its reputation, and it terminated Talbot consistent with its policy regarding the maximum number of complaints the company deemed tolerable.

---

3. (...continued)

employees to termination over contrived complaints from vengeful ex-spouses or a disgruntled co-worker. However, there is no evidence here of falsified complaints, and employers need the flexibility to make decisions on the basis of seemingly reliable information absent evidence of actual—as opposed to wholly speculative—contrivance.

¶18    We conclude that the Board erred in determining that the evidence adduced by Stepsaver was inadmissible hearsay in the context of the multiple complaints against Talbot as a ground for his termination. It follows that the Board erred in concluding that Stepsaver failed to meet its burden of demonstrating culpability by reason of the residuum rule. *See Prosper I*, 2007 UT App 281, ¶ 11. The evidence before us establishes the existence of repeated complaints against Talbot, the seriousness of these complaints, the potential harm that the complaints might cause to Stepsaver, and the plausibility of Stepsaver's position that it needed to terminate its relationship with Talbot to protect its business interests. *See* Utah Admin. Code R994-405-202(1).

CONCLUSION

¶19    We conclude that the Board erred in determining that Stepsaver offered no legally competent evidence in support of its contention that Talbot was culpable. The Board never reached the other two requirements for establishing just cause given its conclusion that Stepsaver failed to establish culpability. We set the Board's decision aside and direct the Board to reevaluate whether Stepsaver satisfied the culpability requirement in view of the foregoing analysis and, if the Board concludes that Stepsaver did, for the Board to consider whether the elements of knowledge and control have been satisfied as well, *see Bhatia v. Department of Emp't Sec.*, 834 P.2d 574, 577 (Utah Ct. App. 1992), and for the entry of such order as may then be appropriate. In our discretion, we grant costs of the appeal to Stepsaver.[4] *See* Utah R. App. P. 34(b).

─────────

─────────

4. Contrary to Stepsaver's suggestion, an award of costs under rule 34(b) of the Utah Rules of Appellate Procedure does not include attorney fees. *See* Utah R. App. P. 34(b).